# Commonwealth ex rel. Ruczynski, Appellant, v. Powers.

Argued January 4, 1966.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*James J. McEldrew*, for appellants.

*Raymond L. McConemy, Jr.*, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, March 22,
1966:

Renee Gunther fell from the path from which so
many erring sisters down through the ages have slipped
and, in consequence, an entirely innocent being is now
in a court of law, a helpless chip on the bewildering
ocean of litigation.   It is the responsibility of the law
to guide this human mite into a harbor of refuge, pro-
tection, care and assured future well-being.

In discharging its responsibility in this respect, the
Court is being assisted by the advice, counsel, persua-
sion and entreaty of two parties, each sincerely con-
vinced that it can provide the better harbor for the
defenseless infant.

The County Court of Philadelphia decided that the physical, mental, spiritual and psychological welfare of the child will best be served by his remaining in the home of Carl William Powers and Alice Marie Powers where he now is. The natural mother of the child, with her husband, appealed to the Superior Court and urged that they be awarded the permanent custody of the baby. The Superior Court, with one Judge dissenting, affirmed the order of the county court. We granted an allocatur. In ordinary circumstances a court should not need to deliberate long to conclude that only injustice would attend a forcible separation between a mother and her child. But we do not have ordinary circumstances here.

Robert Anthony Gunther was born on May 20, 1960. Two and a half years later, his mother handed him over to Carl William Powers and his wife, Alice Marie Powers, executing at the time a formal consent to adoption. Five months later the mother requested the return of her child and the Powerses relinquished him to her, but, holding Robert only four months, the mother decided she could not keep him and, for reasons of her own, once more consigned him to the Powerses apparently with finality. The finality lasted four months and now the mother demanded once more the return of Robert as if he were on a merry-go-round and could be plucked away and returned to a wooden mechanically operated horse at any moment she desired while the hurdy-gurdy music of life played on.

By this time, however, the Powerses were satisfied that the carnival transferring to which Robert was being subjected was not conducive to his best interests and they refused to stop the merry-go-round for Renee Gunther's weather vane changes of mind. They accordingly held on to Robert and petitioned the County Court of Philadelphia for his adoption. The county court granted the petition but this Court reversed the

decree of adoption, directing the lower court, however, to determine custody.[1]

Renee Gunther (now married to Edmund R. Ruczynski) and her husband filed a petition for a writ of habeas corpus and the county court, again considering the case, this time on the question of permanent custody, awarded the child to the Powerses and the Ruczynskis appealed.

In determining the custody of a child of tender years, there is only one polestar, one compass, one standard of reasoning to follow, and that is the best interest of the child. Inevitable as may be the love of a natural mother for her child, certain as may be her resolve to care for the child, unquestioned as may be her devotion to the child, all these poetic but intangible concepts cannot serve as food for the child, shelter for the child, moral guidance for the child. If love for a child is a slice of bread, the parents must prove their devotion by spreading it with the butter of objective solicitude. The stale bread on which Robert gnawed was not softened or made palatable by the butter or jelly of maternal vigilance. When Robert was put into the hands of the Powerses, he was emaciated, untidy, untrained in hygiene, clothed in a rag, could scarcely walk, was easily given to fright, suffered from a running nose and watering eyes, and knew only one word, his own name Bobby. All this, it was testified to, was the result of neglect by the mother. Then, in a short time, under the Powerses' devoted and objective solicitude, the child gained weight, his sores disappeared, he started to walk erectly, and he increased his vocabulary, his first new word being "good," which, the record establishes, could well symbolize his changed being. After learning and repeating "good," he added the word, "mama." And this

---

[1] *Gunther Adoption Case*, 416 Pa. 237, 206 A. 2d 61.

again about sums up this case. Mrs. Powers had become to Robert a "good mama." Which, apparently, is something he had not had before.

Apart from Mrs. Ruczynski's failure to live up to the duties and obligations of a caring mother, it would appear that Mrs. Ruczynski failed to obey the legal and moral laws of the community. At one time she was employed in a house of lewd behavior. She was found guilty of conspiracy to commit obscene acts.

Mrs. Ruczynski complains that these moral lapses in her past do not incapacitate her from being a good mother today. She adds that by taking away her child from her she is being punished for the sins of her past. One may escape punishment for the past but it is very difficult to escape being punished *by* the past. Her previous moral lapses were of such a serious character that with every good will in the world on her part, there is no guarantee for the future.

This opinion is not intended as a castigation of Mrs. Ruczynski nor should it be cited against her willingness to live a good life in the future, but here we are not deciding about Mrs. Ruczynski's future but about Robert's. She let go his hand once, and then again and again when he most needed her guidance. Prognosticating the future by the record of the past, no one can be sure that if she once more seeks to guide him she may not again be distracted and once more release his hand, allowing him to drift or stumble into danger and hurt, a hurt which could damage him seriously for adultship and the duties of citizenship.

But, apart from all this, Robert has now adjusted to the Powerses, whom he regards with the same love and attachment that he could shower on his natural parents. Robert can only know what he sees and feels. Through his eyes and sensory nerves he knows that the Powerses are good to him and will take excellent care of him. They have become his parents, their home

has become his home, their kinsmen are his kinsmen. To take him away now would inflict a serious hurt, even a permanent one. In *Commonwealth ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, this Court sagely said: "A child of two years of age or under will form new attachments quickly if treated kindly by those into whose care it is given. In that respect it resembles a young tree whose roots have not yet taken deep hold in the nourishing earth, but when a child is much beyond the age of two years, it becomes strongly attached to those who stand in parental relationship to it and who have tenderly cared for it. Its bonds of affection have become so strong that to sunder them suddenly may result not only in the child's unhappiness, but also in its physical injury."

The trial court had an excellent opportunity to observe all the parties in this litigation. As was said in *Commonwealth ex rel. Shroad v. Smith*, 180 Pa. Superior Ct. 445, "An experienced trial judge, while conducting a hearing which involves the custody of children, is observing every act of the parties, not only to appraise the truth of their testimony, but also to evaluate their fitness to have custody of the children."

In *Commonwealth ex rel. Children's Aid Society v. Gard*, supra, we said: "Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process. In passing on the contested custody of children no judge can do justice without considering the human aspect of his problem."

In this case, the trial court properly considered this factor, stating: "We are well impressed with the character, good intentions and sincerity of purpose of the foster parents. The child surely has grown to love

them, and has a strong feeling of belonging and security in their home. To his childish mind, home is with the foster parents with whom he has resided most of his young life. The foster parents have given good and loving care to the boy. Strong emotional bonds of affection, loyalty and love have already been firmly established between the child and the foster parents. The latter have given him the material comforts, security, good care, love and affection in a good home and wholesome environment. To disturb him now and place him with Petitioners, who no doubt would appear perfect strangers to him, might work irreparable psychological and emotional harm. We believe and find, therefore, that the best interests and welfare of the child would be promoted and best served by leaving him where he is."

We find no error in law or in fact in the trial court's adjudication, nor any abuse of discretion in reaching the conclusion it announced. We are satisfied that the court was well justified in concluding that the well-being of Robert dictated that he not be taken from the Powers home, the only true home he had in fact ever known. The Superior Court properly affirmed the order of the County Court of Philadelphia and its order should be affirmed.

Order affirmed.

Mr. Justice ROBERTS concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority opinion, in heartrending allegory, has affirmed a custody order delivered by a court which never should have heard the case, having already prejudiced the matter before the parties had had their second day in court. This unhappy matter came before the courts of this Commonwealth for the first time when the present appellees petitioned the County Court

of Philadelphia for adoption of one Robert Gunther. The county court, having found that the child was abandoned by his mother (the present appellant) and that his welfare would be promoted by an adoption, granted the adoption petition. This Court, in an opinion by Justice JONES, found no abandonment and vacated the decree of adoption, remanding the case for a determination of custody with the observation that: "The court below, understandingly, placed great stress upon its finding that the best interests of the child would be promoted by this adoption. The question of the best interests of a child is all important in custody cases, but, in adoption, the welfare of the child is to be considered *only after* it has been determined that the natural parent has abandoned the child . . . ." *Gunther Adoption Case,* 416 Pa. 237, 241-242, 206 A. 2d 61, 64 (1965).

I submit that on the face of the decree of adoption, the judge below had decided the issue of the best interests and welfare of the child, which this Court admits is "all important in custody cases . . .," well before the parties came before her for the second time in this custody proceeding. I believe that the trial judge should have recognized this fact and disqualified herself from hearing the case.

Accordingly, I would vacate the order of the lower court and remand the case with instructions that another judge of the bench of the County Court of Philadelphia, who has not previously disposed of the cardinal issue, determine the custody of this child.

I dissent.

Mr. Justice JONES joins in this dissenting opinion.