426 A.2d 137

**Martha Ann DILE**

v.

**Mary A. DILE, Appellant.**

Superior Court of Pennsylvania.

Argued March 3, 1980.

Filed Feb. 20, 1981.

460

Edwin R. Frownfelter, McConnellsburg, for appellant.

R. Harry Bittle, Chambersburg, for appellee.

Before CERCONE, President Judge, and WATKINS and MONTGOMERY, JJ.

PER CURIAM:

The instant case is an appeal taken by Mary A. Dile [hereinafter referred to as "mother"] from the order of the

lower court which awarded primary custody of the mother's two children, Keith Alan and Yudie L. Dile, to Martha Ann Dile, the children's paternal grandmother [hereinafter referred to as "grandmother"].[1] In her brief, the mother makes three arguments: (1) that the court below erred when, pending the full custody hearing, it allowed the grandmother to retain custody of the children; (2) that the court below erred in finding that the grandmother had shown sufficient reasons at the hearing to justify an award of custody to her; and (3) that the visitation order for the mother entered by the court was unduly restrictive regarding the children's contact with non-related adult males. We find appellant's first two arguments to be unpersuasive, however, we do find that the lower court awarded its restriction in the visitation order too broadly, and therefore we modify that order.

The mother first argues that the lower court erred when, pending the full custody hearing, it allowed the grandmother to retain custody of the two children. The mother would have us rule that a court may never grant a temporary custody order to a third party where a child's natural parents are available to take custody. We must reject this argument as being devoid of merit.

As the court below wrote in its opinion, of necessity, the children had to be somewhere during the pendency of the action. The temporary custody order was granted to the grandmother to maintain the status quo until a hearing could be held. The position advanced by the mother has no authority to support it, and we find it to be without merit.

The mother next argues that as a matter of law the evidence at the hearing failed to indicate "convincing rea-

---

1. The children's natural father, Keith Dile, does not want custody of the children but he did testify at the custody hearing, saying that he felt that his mother [the grandmother] was better able to handle the children than his wife, Mary Dile.

   At the time of the custody hearing, no divorce proceedings had been filed and neither Mary nor Keith Dile gave any indication when, if ever, such proceedings would commence.

sons" why the best interest of the children would be served by awarding custody of the children to the grandmother.[2] In this Court's decision of *In re: Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977), we clarified the standard to be used in custody cases when the dispute is between a parent, or parents, and a third party, distinguishing it from the case of parent versus parent or parent(s) versus the state. In *Hernandez*, we said,

"When the judge is hearing a dispute between the parents, or a parent, and a third party, the manner of inquiry is more complex. The question still is, What is in the child's best interest? However, the parties do not start out even; the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side." *Id.*, 249 Pa.Super. at 286, 376 A.2d at 654 (footnote omitted).

The Supreme Court specifically adopted the principles established by *Hernandez* in *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980). In part, the *Ellerbe* Court wrote,

"No doubt in some instances the best interests of the children are served by awarding custody to a non-parent. Experience has taught the unhappy lesson that the parental relationship is not an infallible guarantee that the parent will provide the care and concern essential to a child's proper development.

\* \* \* \* \* \*

2. The scope of review by the Superior Court in custody cases is quite broad and while this Court cannot nullify the fact finding function of the hearing judge, it is not bound by deductions or inferences made by the hearing judge from the facts found. *Commonwealth ex rel. Drum v. Drum*, 263 Pa.Super. 248, 397 A.2d 1192 (1979).

Nevertheless, we believe the rule we adopt today reflects the important need for restraint in an area where the judiciary should proceed with the utmost caution. Thus where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." *Id.*, 490 Pa. at 366, 416 A.2d at 514.

In *Ellerbe*, the Supreme Court awarded custody of a girl, aged twelve, to the maternal grandmother instead of to the child's natural father, thereby reversing this Court's decision in *Hooks v. Ellerbe*, 257 Pa.Super. 219, 390 A.2d 791 (1978). In so doing, the Supreme Court gave great weight to the fact that the child had lived with her grandmother from approximately age two until age twelve and "had developed stable and happy relationships with her grandmother, with neighborhood friends and, importantly, at school." *Ellerbe v. Hooks, supra*, 490 Pa. at 366, 416 A.2d at 515. The Supreme Court in *Ellerbe* made no specific reference to the conditions of the father's home in its opinion, but in our opinion it was noted that the father visited his child infrequently.

In *Commonwealth ex rel. Husack v. Husack*, 273 Pa.Super. 192, 417 A.2d 233 (1979), this Court awarded custody of two boys ages fourteen and sixteen, to the boys' stepmother rather than to the boys' natural father, where the boys expressed fear of their father, characterizing him as too authoritarian, capable of inflicting severe physical punishment, and unconcerned about their needs. In *Husack*, we said,

"The primary consideration in any child custody proceeding is to determine the best interests of the children. *'Best interests' not only include the children's physical well being, but also their intellectual, spiritual, and moral well being. Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977); *Commonwealth ex rel. Pruss v. Pruss*, 236 Pa.Super. 247, 344 A.2d 509 (1975)." *Id.*, 273 Pa.Super. at 196, 417 A.2d at 235. (emphasis added)

In the case at bar, the hearing judge listed many factors in support of its decision to award custody of the children to the grandmother. At the time of the hearing in November of 1978,[3] the mother had started living with Herbert Kriner, a man with an extensive and varied criminal record, in October of 1978. Regarding Herbert Kriner, the hearing judge adduced that in the eight year period between March of 1967 and January of 1975, Kriner had been convicted six separate times on charges of burglary, larceny, receiving stolen goods, twice for armed robbery, assault and battery and other related offenses. During this eight year period, Kriner was twice adjudged to be in violation of the terms of his parole. At the time of the instant custody hearing in 1978, court records indicated that Kriner had been on parole since August 2, 1977, however, during that time he had been charged with unspecified offenses twice but both times the charges were dropped. Kriner testified at the custody hearing that both he and Mary Dile (the mother) had smoked marijuana but that both of them had stopped smoking marijuana at some unspecified time before this custody action was started. Herbert Kriner testified that he had learned a lesson as a result of his convictions and that he would "like to settle down and raise a family instead of going back and forth to jail." Despite this particular statement of Kriner, the court below in its opinion indicated its concern that Kriner would have an adverse influence upon the children.

The court also took into consideration a particular episode which occurred on October 26, 1978. On that date, an ambulance was called to the mother's home and the ambulance attendants found Herbert Kriner lying in the doorway frothing at the mouth and seeming to slip in and out of consciousness. He refused to let anyone get close to him or take him to the hospital emergency room. Subsequently, at the custody hearing, Kriner explained this incident by saying that he had "O.D.'d" when some unknown person put something into his alcoholic beverage.

3. The custody hearing in this case was held on four separate dates between November 30, 1978 and January 26, 1979.

■ The court below also considered the physical environment of the mother's house. At the time of the hearing, the mother was living in a rented house which had four bedrooms on the second floor and an additional room on the first floor which was being used as a bedroom. Seven people resided in this house: Mary Dile, Herbert Kriner, Isabelle Smith, who is Kriner's mother, and her son,[4] Kriner's sister, Kathy Kriner and her son, and Kriner's brother, John Kriner. The court disapproved of this arrangement, saying, "The residents of this house have, moreover, been transient since mother's separation from her husband in May 1978. There is no indication that Isabelle Smith or any of the other current residents would feel any responsibility to Alan and Yudie, or that any stability in the children's relationships could be anticipated from the present living arrangements in mother's home." The court considered this an important factor since the mother testified that while she was working, Isabelle Smith would care for Alan and Yudie.[5]

There was also some evidence introduced, via the testimony of the grandmother, that Alan and Yudie were not properly attended to. The grandmother testified that several times when she came to the mother's house to see the children, she found them sitting in wet diapers.

Additionally, the court took note of the mother's lifestyle before she moved in with Herbert Kriner. Previously, the mother shared a house with another woman named Terry Hughes and the latter's two small children. The testimony indicated that Terry Hughes was an extremely poor housekeeper and that for as long as the mother lived with Terry

4. The relationship of this individual to Herbert Kriner is not apparent from the record, so we do not know if this son of Isabelle Smith is a blood relative to Herbert Kriner or not.

5. In her brief, the mother asserts that she and Herbert Kriner are now living in a house together without the other members of his family. We cannot consider this assertion in our decision. The Superior Court is bound to consider only those facts which are in the record, and may not consider those interjected by briefs of counsel. *In Interest of Carroll*, 260 Pa.Super. 23, 393 A.2d 993 (1978); *Greene v. Liebergotti*, 235 Pa.Super. 475, 344 A.2d 501 (1975).

Hughes the house was littered with clothes and dirty dishes. Of more import, however, is the fact that one of the mother's babysitters, a girl of sixteen named Kim Carbaugh, was a chronic truant and that the mother and Terry would allow Kim to stay with them and to drink beer. On one occasion, on September 23, 1978, the mother and her children, Terry and her children, a man named Rickey, and Kim were riding in a car. Kim, after drinking several bottles of beer, took some Valium pills which she had taken from her mother. The combination of beer and Valium caused Kim to "O.D.," i. e., she could not be kept awake, and Kim had to be taken to the emergency room of Chambersburg Hospital for treatment. While there is no evidence that the mother either provided Kim with the beer or drugs or encouraged her to take them, nonetheless, the mother made no effort to stop Kim from doing this. The court below concluded that in this respect the mother acted irresponsibly.

The court contrasted the mother's lifestyle with that of the grandmother. It is not necessary for us to go into detail regarding the grandmother's home. Suffice it to say, that the evidence indicates it to be adequate and wholesome. The grandmother is a widow, forty-nine years old at the time of the hearing. The grandmother is an office manager and sales associate for a realty company and works approximately eight hours a day. In 1979, she earned approximately $28,000 per year. While the grandmother is at work, the children are watched by their aunt, Vicki McKee. The grandmother takes the children to St. Luke Lutheran Church regularly.

In view of the above evidence, we find that the lower court did not err in holding that the grandmother showed sufficient "convincing reasons" to demonstrate that the children's best interest will be served by awarding primary custody to the grandmother instead of the mother. While no single factor can be said to warrant this decision, when all of these factors are considered together, particularly in

view of the past history of Herbert Kriner, we can find no error in the court's decision at this time.

Lastly, the mother argues that the visitation order is unreasonable because it restricts the mother from exercising her visitation privileges "in the presence of any adult male not related to the mother by blood or marriage." The mother argues that it is apparent that the court's intent was to exclude Herbert Kriner from the visitation period, however, the mother points out that literally read the flat prohibition on contact with any unrelated male, bars contact with any males not related to the mother, including casual friends, the mother's attorney, taxi drivers, ministers, doctors or whomever. The mother, by her attorney, asked the court to modify this order since the mother is dependent upon other people for transportation (particularly since her neighborhood has no public transportation system). The court denied the mother's request, saying that the court assumed that the mother had some female friends. In its subsequent opinion, the court stated that it was concerned with the effect of men other than the children's natural father being presented to the children as "intimates of their mother."

In *Commonwealth ex rel. Drum v. Drum*, 263 Pa.Super. 248, 397 A.2d 1192 (1979), this Court approved a custody order which provided that the father, who was still legally married to the children's mother could not exercise his visitation privileges in the presence of his specifically named female companion with whom the father was living. We found such a limitation to be in the best interest of the children in that case since the mother's reason for asking for such a restriction was because the father's living arrangement ran completely contrary to the religious teachings instilled in the children by their parents.

In the case *sub judice*, the single most important reason for awarding custody of the two children to the grandmother was the court's justifiable concern with the

influence of Herbert Kriner over the moral development of the children, in view of the fact that Kriner has a rather long criminal record which includes several convictions for violent crimes. This being the case, we find the court's restriction to be unnecessarily broad. Therefore, we amend the lower court's order, striking from it the restriction against "unrelated adult males" and instead modify the restriction to prohibit the mother from exercising her visitation privileges in the presence of Herbert Kriner.

■ However, we wish to emphasize that neither this restriction nor the custody order itself need be viewed as permanent. Child custody orders are temporary in nature and subject to change if new circumstances arise affecting the welfare of the children. *Commonwealth ex rel. Hickey v. Hickey*, 216 Pa.Super. 332, 264 A.2d 420 (1970); *Commonwealth ex rel. Beemer v. Beemer*, 200 Pa.Super. 103, 188 A.2d 475 (1962). In this Court's view, the factor which tipped the scales in favor of awarding custody to the grandmother was the fact that the mother chose to live with Herbert Kriner, a man with several convictions for violent crimes. The future so far as the mother's desire for custody is concerned, depends on changes in her circumstances that would be in the best interest of the children to be in her care, taking into consideration, as we must, the weight of the law in her favor in the fight for custody between parent, or parents, and a third party.

Accordingly, the order of the court below awarding primary custody of the children Keith Alan and Yudie L. Dile to Martha Ann Dile is affirmed. The order forbidding Mary A. Dile from exercising her visitation rights "in the presence of any adult male not related to the mother by blood or marriage" is hereby amended so that this restriction applies only to the presence of Herbert Kriner, and not to all nonrelated adult males.

It is so ordered.