445 A.2d 1243

**In re WESLEY J. K., a Minor Child.**

**Appeal of ROSEMARIE K., Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 21, 1981.

Filed May 21, 1982.

506

Robert C. Saidis, Carlisle, for appellant.

Kevin Hess, Carlisle, for appellee.

Before BECK, WATKINS and HOFFMAN, JJ.

BECK, Judge:

This appeal arises from a Petition for Custody by appellant-mother. A custody order was issued on April 22, 1981 granting custody to appellee-father. Extensive visitation was granted to appellant.[1]

■ It is well-settled in custody matters that this court's scope of review is of the broadest dimensions. This court in *Dena Lynn V. v. Harvey H. F.*, 278 Pa.Super. 95, 100, 419 A.2d 1374, 1377 (1980) stated:

Although we are still tied to the facts as found in the court below, as we are to the lower court's determinations about credibility of witnesses and weight given their testimony, *Commonwealth ex rel. Harry v. Eastridge*, 374 Pa. 172, 177, 97 A.2d 350, 353 (1953), ". . . (w)e are not bound, on appeal by deductions or inferences made by the lower court; *Commonwealth ex rel. Gifford v. Miller*, 213 Pa.Super. 269, 248 A.2d 63 (1968), . . ." *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 88, 369 A.2d 821, 823 (1977). It is also well settled that our sole function in making our review is to assure the "best interest of the child" is served. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976). And finally, of particular relevancy in a case which is so steeped in emotion as this, we must inquire only into relevant facts as they

---

1. The visitation arrangement agreed upon by the parties prior to the hearing was that Rosemarie had Wesley each Sunday from 12:00 p. m. until 6:30 p. m., each Tuesday from 4:45 p. m. until 8:00 p. m., and every other Friday at 5:00 p. m. until Saturday at noon. The hearing judge did not change that voluntary arrangement when he imposed his visitation order.

affect the relationship between parent and child—not parent and parent or parent and stranger to that intimate relationship. *See In re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978).

In the instant case, we are at odds with the inferences made by the trial judge in interpreting the testimony before him.

Rosemarie K. and Michael K. were married in October, 1975; they separated in May, 1980. They agreed at the time of separation that Rosemarie would retain custody of their two year old son, Wesley.

In December, 1980, Rosemarie voluntarily relinquished custody to Michael because she was suffering from exhaustion and was frustrated with her time pressures and her financial situation. She had taken a second job and was working the equivalent of a seven day week.[2] Rosemarie testified:

> I told him that I was very exhausted working the two jobs. I felt very guilty for Wes having to go to a fulltime sitter in the evening [sic] and a parttime sitter at night. I was not able to spend the amount of time with him that I had wanted to because of the second job, and I thought it was best for Wesley at the time if Mike could take him temporarily until I could sell the house and find an apartment where I didn't have to work two jobs.

(N.T. 11.) Michael similarly testified on cross-examination that Rosemarie relinquished the child because she was exhausted. (N.T. 37.) We draw no negative inference from Rosemarie's action in temporarily turning over the child to Michael. Rather, we construe same as the action of a concerned and loving mother interested in promoting the best interest of her child at that juncture.[3]

2. Rosemarie testified that through the end of August she received approximately $55.00 weekly for expenses in addition to $25.00 weekly for the babysitter. At the end of August, Michael notified Rosemarie that he had arranged to move in with his paramour and that the amount of support he would contribute weekly was $35.00. (N.T. 6–8.) Michael testified that the amount was $70 or $75 biweekly. (N.T. 35.)

3. *See In re Arnold*, 286 Pa.Super. 171, 174, 428 A.2d 627, 628 (1981):
It is axiomatic that the polestar of any custody proceeding is the best interests of the child, a term which encompasses her spiritual,

■ There was testimony that Michael and his girlfriend were hesitant to take Wesley when Rosemarie asked them to do so. We draw no negative inference from that testimony, either. There was rebuttal testimony that Michael's girlfriend did not wish her daughter to become attached to Wesley and then to see him forever removed from their home. (N.T. 18.) We construe this as the act of a concerned parent, both for her own child and for that of her boyfriend. In any case, Michael and Nancy did take Wesley into their home in December.[4]

■ It is also indicated in the record that Rosemarie earns approximately $13,000 per year, while Michael earns approximately $13,500. (N.T. 5, 22.) Since Nancy earns $17,000, their combined income is significantly greater than Rosemarie's income. (N.T. 22.) There is no evidence here, however, that Rosemarie is unable to provide adequately for Wesley, and that is the sole permissible inquiry involving relative wealth in a custody determination. *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977).

■ The hearing judge stated that he was leaving Wesley with his father because the mother had minimal time to spend with the child. That finding is not supported in the record. At the time of the hearing the mother had resigned

physical, emotional and intellectual well being. *In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979); *In re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978); *Commonwealth ex rel. Scott v. Martin*, 252 Pa.Super. 178, 381 A.2d 173 (1977); *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977).

4. It should be noted that the hearing judge correctly ruled that the mere fact that Michael was involved in a non-marital relationship is insufficient to deny him custody of his son. It is the effect of that relationship on the child which is crucial to the custody decision. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976); *In re Donna W.*, 284 Pa.Super. 338, 425 A.2d 1132 (1981); *In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976).

from her second job. Her current job in the Commonwealth's employ occupies her from 7:30 a. m. to 4:00 p. m.; it appears that the hearing judge predicated the above conclusion upon her situation prior to resigning from her part-time job. (N.T. 10.) In fact, he noted that there appeared to be no difference between her situation at the time of the April hearing and in December when she relinquished Wesley to his father. We find that to be an inaccurate inference. In December, Rosemarie was suffering from exhaustion and depression. She was having trouble paying her bills. The record indicates that she was functioning much better in April and that she was working a "normal" work week. At the time of the hearing, she had sold her house and was living in a two bedroom apartment; her financial picture was much brighter than in December. (N.T. 13–14.)

It must also be noted that Rosemarie apparently feels strongly that Wesley has the benefit of his father's companionship. In discussing other temporary custody arrangements that she considered before contacting his father in December, she said she declined sending Wesley to her parents in Florida because he would be too far from her as well as too far from her former husband. (N.T. 66–67.)

The record in this case was singularly devoid of the rancor usually apparent in a custody hearing. The most serious allegation aimed at either party was that of the father that Rosemarie was incapable of disciplining Wesley, and that allegation was explicitly rejected by the hearing judge. (N.T. 70.)

The record was conspiciously devoid of any allegation that either party did not love or care for Wesley and so the trial court found that "[b]oth parents care for this child and both have cared for him and with that in mind, hopefully, he will be less damaged by the fracture of the situation than otherwise." (N.T. 71.) Unfortunately, the order ignored the sentiment above expressed and awarded sole custody to the father. Perhaps there is a better solution, and this court

remands for the lower court to consider a shared custody arrangement.[5]

In the instant case the hearing judge was faced with that most difficult of custody determinations—the choice between two very competent and loving adults. Selection of either to the exclusion of the other presents serious problems. There is much available literature outlining problems associated with sole custody orders.[6] One of the threads running through the literature is the harm resulting from severing meaningful contact with the non-custodial parent:

> Generally, children develop an attachment to *both* parents, even though one parent may play an inactive role in the child's development. These attachments are different from others because children depend on them for their security or well-being. If either of these attachments is severed, children suffer greatly. Not only do they hurt from the present loss, their future relationships may be jeopardized. For example, once these attachments are broken, children may become reluctant to place their trust in someone else as completely. They will form new attachments, but in all probability these ties will not be as strong as they would have been if the early attachment bond had not been severed.
>
> ... The children often feel abandoned and rejected. It shakes their basic sense of security to see someone they have loved and trusted gone from their lives.

**5.** Section 5 of the Custody and Grandparents Visitation Act ("Act"), Act of November 5, 1981, Act 1981–115, 23 P.S. § 1001 *et seq.* endorses such a shared custody award "when in the best interest of the child...."

**6.** The primary problem with a sole custody order is that contact with the non-custodial parent is drastically limited. *See* Folberg and Graham, *Joint Custody of Children Following Divorce,* 12 U.Calif.D. L.Rev. 523, 535 (1979) (footnotes deleted) (emphasis in original):
*[R]esearchers are finding that the key variable affecting satisfactory adjustment of children following divorce is the extent of continuing involvement by both parents in child rearing. Similarly, divorces having the least detrimental effect on the normal development of children are those in which the parents are able to cooperate in their continuing parental roles.*

When placed in sole custody, children often see the absent or "visiting" parent as a second-class person; if the children have identified with this parent, they may feel inferior also.

Bratt, *Joint Custody*, 67 Ky.L.J. 271, 296–297 (1978–79) (footnotes deleted) (emphasis in original).

An alternative to the traditional sole custody arrangement is "shared" or "joint" custody wherein legal custody is shared while physical custody is alternated by the agreement of the parties.[7] The philosophic premise of shared custody is the awarding to both parents of responsibility for decisions and care of the child.[8] In the past non-custodial, conscientious parents have been frustrated by the second-class status to which the law has assigned them. It was difficult to develop healthy relationships to a child where their role may have been limited to a weekend parent whose counsel was not sought in decisions affecting the child. Shared custody allows both parents input into major decisions in the child's life.

Such an arrangement "foster[s] more 'natural' relations within the divorced family; in other words, it more nearly

**7.** The terms "shared custody" and "joint custody" are synonymous. We will refer to "shared custody" throughout our discussion. Some of the authorities we cite, however, refer to the same concept as "joint custody." In order to obviate any confusion, we explicitly state that the above terms are interchangeable.

**8.** Shared custody need not encompass shared "physical" custody; it may constitute merely shared "legal" custody. Shared "legal" custody entails joint input in all major decisions affecting the child, i.e., educational, medical, and religious matters. Shared "physical" custody entails the child splitting his or her time between the two homes. *See* Miller, *Joint Custody*, 13 Fam.L.Q. 343, 360 (1979):

There are two basic versions of joint custody: joint "legal" custody and joint "physical" custody. The former consists exclusively of the shared decision making function. The latter has the additional component of shared residence. That is, under joint physical custody the children live with each parent on an equal or split-time basis. Thus, in a sense, minor as well as major decisions are made by both parents where there is joint physical custody. Examples of these minor matters are what and when to eat, when to do chores, and when to go to bed. In joint legal custody, only one parent has physical custody, and that parent makes these day-to-day decisions.

approximates the intact nuclear family. To be trite, parents do not divorce their children. Children have the same parents despite a divorce." Miller, *Joint Custody*, 13 Fam. L.Q. at 362.

In addition, under a shared custody arrangement, the child is less likely to be used by the custodial parent as a weapon against the non-custodial parent:

> In sole custody, the custodial parent can frustrate the visiting rights of the non-custodial parent, and short of going back into court, the visitor has no way of enforcing his or her rights. The sole custodial parent also has more opportunity to present a negative or distorted picture of the absent parent. In joint custody, neither parent has a superior legal advantage and is therefore less likely to take unfair advantage of the other. Because both parties have legally established rights to care for their child and to make decisions about their child's welfare, neither parent can obtain concessions by threatening to prevent the other from seeing the child; nor can one make a major decision without consulting the other.

Bratt, *Joint Custody*, 67 Ky.L.J. at 306.

It should be noted that in a recent New Jersey case, *Beck v. Beck*, 86 N.J. 480, 432 A.2d 63 (1981), although neither party requested shared custody, the trial court decided that arrangement was in the best interest of the children. In deciding that courts have the authority to decree such an arrangement, the *Beck* court cited the New Jersey statute authorizing courts to make custody determinations: "[T]he court may make such order . . . as to the care, custody, education and maintenance of the children, or any of them, as the circumstances shall render fit, reasonable and just. . . ." *Id.* at 485, 432 A.2d at 65. The *Beck* court concluded that "[t]his provision evinces a legislative intent to grant courts wide latitude to fashion creative remedies in matrimonial custody cases." *Id.* In deciding that a trial court may make a sua sponte custody determination, the *Beck* court stated: "The paramount consideration in child

custody cases is to foster the best interests of the child ... It would be incongruous and counterproductive to restrict application of this standard to the relief requested by the parties to a custody dispute." *Id.* at 497, 432 A.2d at 71.

■ In deciding whether courts of this Commonwealth have authority to decree shared custody arrangements, attention to a recent legislative enactment is helpful:

The General Assembly declares that it is the public policy of this Commonwealth, when in the best interest of the child or children, to assure a reasonable and continuing contact of such child or children with both parents after a separation or dissolution of marriage, and the sharing of the rights and responsibilities of child rearing by both parents.

Section 2 of the Custody and Grandparents Visitation Act ("Act"), Act of November 5, 1981, Act 1981–115, 23 P.S. § 1002.

Section 3 of the Act, 23 P.S. § 1003, defines "legal custody," "physical custody" and "shared custody" as follows:

"Legal custody." The legal right to make major decisions affecting the best interests of a minor child, including but not limited to, medical, religious and educational decisions.

"Physical custody." The actual physical possession and control of a child.

"Shared custody." An order awarding shared legal or shared physical custody or both of a child in such a way as to assure the child or children of frequent and continuing contact, including physical access, to both parents.

In Section 5 of the Act, 23 P.S. § 1005, our courts are granted broad discretion in determining when to order "shared custody," and it is clear that the courts may award such custody sua sponte as long as that award comports with "the best interests of the child."

Although shared custody in appropriate circumstances is desired, under the new legislation there is no presumption favoring shared custody. Such a presumption would de-

mand shared custody unless one party could rebut the presumption. The presumption-free law permits the lower court to engage in a full, fair and comprehensive examination of the best interests of the child. It does not place an unreasonable burden on a long-time custodial parent to defend the status quo.

■ We would not suggest that such an arrangement is in the "best interests of the child" in every case, and we therefore suggest the following guidelines as discussed in the *Beck* decision in determining when the imposition of shared custody is appropriate. Clearly, both parents must be "fit." "Both parents must be sane and capable of making rational child-rearing decisions. Both must be willing and able to provide love and care for their children." Miller, *Joint Custody*, 13 Fam.L.Q. at 369. The trial judge explicitly found that both parents provided love and care for Wesley, and there were no allegations that either party was incapable of making rational decisions about Wesley's welfare. Similarly, there was no hint of abuse or neglect on the part of either party.

■ Another important consideration to the awarding of shared custody is a desire on the part of both parents for a continuing active involvement in their child's life. This is not to suggest that both parents need to seek a "shared custody" arrangement; seeking to take care of the minor child on a "sole custody" basis is sufficient. We do prefer a "voluntary" shared custody agreement to an arrangement imposed by the court. Still, we conclude that where the record indicates an ability on the part of both parents to place the interests of the child before their own, a court may order shared custody.

■ It is also necessary that the child has formed a relationship with both parties. "[F]rom the child's point of view it is necessary only that the child recognize both

parents as sources of security and love and wish to continue both relationships." *Beck*, 86 N.J. at 497–498, 432 A.2d at 71. It was uncontroverted that Wesley loves both of his parents and is happy and well-adjusted in both homes.[9]

A minimal degree of cooperation between the natural parents is another important consideration to awarding shared custody:

> This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor.

*Id.* at 498, 432 A.2d at 71–72.

The absence in the record of animosity of one parent toward the other strengthens the case for shared custody. Michael and Rosemarie have been able during their marriage and after its dissolution to communicate as to the well-being of their son. When they separated, Michael and Rosemarie communicated thoroughly in deciding that Wesley should remain with his mother and that his father should have liberal access to him. (N.T. 24–25.) Also, when Rosemarie was overwhelmed by the demands of her two jobs and concerned that she was not adequately taking care of Wesley, she was able to talk with Michael, who agreed to share in the responsibility for his son. (N.T. 11.)

Similarly, their cooperation in protecting Wesley's best interests was amply supported in the record. They cooperat-

**9.** As in all custody decisions, the preference of the child should be considered. It is, however, only one factor in the "best interest of the child" calculus. *Hugo v. Hugo*, 288 Pa.Super. 1, 430 A.2d 1183 (1981); *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977). Maturity and intelligence, of course, should be considered. *Commonwealth ex rel. Husack v. Husack*, 273 Pa.Super. 192, 417 A.2d 233 (1979). The fact that the child indicates a love for both parents should be considered when deciding the efficacy of a shared custody order.

ed in establishing and complying with a workable schedule of visitation when Wesley was staying with his mother and later with his father. (N.T. 15, 32.) When they were married, Michael and Rosemarie shared household responsibilities, including all care of Wesley. (N.T. 36, 40.)

The satisfaction of the above requirements that 1) both parents are "fit," 2) both desire continuing involvement with their child, 3) both parents are seen by the child as sources of security and love, and 4) both parents are able to communicate and cooperate in promoting the child's best interests makes Wesley's situation a particularly strong one for the decreeing of a shared custody arrangement.[10]

Trial courts may fear that shared custody will impose additional burdens on them because they will be drawn into conflicts between parents when they disagree on decisions affecting the child. While theoretically this may be, we trust this will happen only rarely. Giving both parents legal and physical responsibility for the child should attenuate the animosity and the "have not" feeling that so often existed in the non-custodial parent which caused the non-custodial parent to petition regularly for custody. If shared custody proves unworkable because parents cannot agree and seek frequent court intervention, then the trial court may have to consider withdrawing the shared custody status.

We remand to the hearing judge with instruction to ascertain through such additional testimony as he deems necessary, whether the above factors supporting a shared custody arrangement are indeed present here. Jurisdiction is transferred to the lower court.

WATKINS, J., dissents and would affirm on the opinion of the court below.

10. We note here that geographical proximity certainly facilitates the success of a shared "physical" custody arrangement, but it is largely gratuitous to the success of shared "legal" custody. Major decisions can be resolved by telephone. *See* Miller, *Joint Custody*, 13 Fam. L.Q. at 373.