535 A.2d 200

**Michelle A. DeNILLO, Appellant,**

v.

**Samuel C. DeNILLO.**

Superior Court of Pennsylvania.

Argued Sept. 11, 1987.

Filed Dec. 30, 1987.

Richard S. Levine, Pittsburgh, for appellant.

P. Louis DeRose, III, Greensburg, for appellee.

Before BECK, JOHNSON and HESTER, JJ.

HESTER Judge:

This appeal is from the hearing court's decision of December 4, 1986, ordering appellant, Michelle DeNillo, and appellee, Samuel DeNillo, to continue sharing physical custody of their child, Sam, on an alternating weekly basis. Sam, born March 19, 1982, is five years old. We reverse and remand.

On March 7, 1983, pursuant to the parties' agreement, the court awarded custody of Sam, who was then eleven months old, to appellant. The court later filed an amended order on April 11, 1983, providing for joint legal custody, with primary physical custody awarded to appellee until appellant could arrange suitable housing.

Thereafter, on September 20, 1983, again pursuant to the parties' agreement, the court awarded shared physical custody of Sam to his parents on alternating weeks. That order also provided for a review seven months later on April 24, 1984. A series of three hearings then were held: April 24, 1984, August 21, 1984, and March 3, 1986. In the interim, on January 26, 1984, the parties were divorced. Finally, on December 4, 1986, the hearing court ordered continued shared custody of the child, holding that any other arrangement was not in the child's best interest. This appeal followed.

There are two issues before us. The first is whether the hearing court erred in refusing to consider appellee's criminal sexual misconduct as evidenced by his participation in an Accelerated Rehabilitative Disposition (ARD) program after being held for court on two counts of indecent exposure. The second issue concerns the propriety of the order of shared custody in light of the guidelines established in *In re Wesley, J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982).

At the first hearing held April 24, 1984, Officer Thomas Mason of the City of Jeannette Police Department testified that following an investigation he arrested appellee on two counts of indecent exposure. A preliminary hearing was held on December 5, 1983, at which the two victims appeared and testified. Notes of Testimony (N.T.), 4/24/84, at 8–9. Following the hearing, appellee was held for court on both counts. *Id.* at 9. On February 1, 1984, appellee elected to participate in an ARD program and was given two years probation. *Id.* Other requirements of the probation included a mental evaluation and the payment of the costs of prosecution.

Appellant presented the above testimony in support of her request for primary physical custody of Sam. In addition to arguing that the alternating weekly schedule was failing, appellant requested the hearing court to consider the effects of appellee's criminal conduct, as evidenced by his election to participate in ARD, not only upon the child, but also upon appellee's fitness as a custodian.

In rejecting the notion that it should have considered appellee's misconduct, the hearing court failed to acknowledge that an individual is not considered for ARD until he has been held for court at a preliminary hearing, unless such a hearing is waived. In this case, a preliminary hearing was held, and the charges against appellee were held for court. Thus, the Commonwealth must have established the existence of a prima facie case.

While it is true that admission to an ARD program is not equivalent to a conviction, *Commonwealth v. Knepp*, 307 Pa.Super. 535, 453 A.2d 1016 (1982); *Commonwealth v.*

*Krall*, 290 Pa.Super. 1, 434 A.2d 99 (1981), it is equally true that ARD is legally relevant in certain proceedings. *See* 75 Pa.C.S. §§ 1534, 1542(c), 1539(c); *Commonwealth, Department of Transportation v. McDevitt*, 57 Pa.Cmwth. 589, 427 A.2d 280 (1981), *aff'd*, 500 Pa. 532, 458 A.2d 939 (1983) (election by motorist to participate in ARD program constitutes a knowing waiver of motorist's right to prove his innocence and amounts to a conviction for purposes of classifying the motorist as an habitual offender). Further, even when an ARD program is successfully completed, the charges are dismissed, and no conviction results, neither the original charges nor the individual's participation in the ARD program are removed from the record in the event of subsequent criminal activity. *Commonwealth v. Knepp, supra.* We noted in *Commonwealth v. McSorley*, 335 Pa.Super. 522, 485 A.2d 15 (1984), *aff'd per curiam*, 509 Pa. 621, 506 A.2d 895 (1986), that successful completion of ARD is not equivalent to a finding of innocence. *See Commonwealth v. McKellin*, 9 D. & C.3d 572 (1979).

Given the analogous issues heretofore decided, it is clear that in certain circumstances consideration may be given to an individual's participation in an ARD program. We believe that the criminal charges against appellee, even though disposed of through ARD, are relevant in this custody dispute.

Our research reveals that applicable cases exist wherein a parent seeking custody had a criminal record and the court properly considered it, although the court's consideration of the record was not an issue in the cases. *See, e.g., Ferencak v. Moore*, 300 Pa.Super. 28, 36, 445 A.2d 1282, 1286 (1982) ("Nor can we or should we ignore [the mother's] criminal record....") and *Commonwealth ex rel. Ruczynski v. Powers*, 206 Pa.Super. 415, 212 A.2d 922 (1965), *aff'd*, 421 Pa. 2, 219 A.2d 460 (1966) (mother's criminal record involving moral turpitude may be examined and evaluated by the courts in attempting to determine her probable future actions").

Similarly, there are cases in which a parent seeking custody was romantically involved with someone who had a criminal record. For example, *Dile v. Dile*, 284 Pa.Super. 459, 426 A.2d 137 (1981), involved a custody dispute between the paternal grandmother and the natural mother. In affirming the trial court's award of custody to the grandmother, this court stated, "[T]he factor which tipped the scales in favor of awarding custody to the grandmother was the fact that the mother chose to live with ... a man with several convictions for violent crimes." *Id.*, 284 Pa.Superior Ct. at 468, 426 A.2d at 142.

It is clear that a custody court has an obligation to consider all relevant factors that could affect the child's well being, as its paramount concern is the child's welfare and best interests. *Jones v. Stone*, 343 Pa.Super. 416, 495 A.2d 205 (1985). In this case, we are not concerned with idle gossip or unsubstantiated allegations. Rather, this case involves appellee's arrest for charges of indecent exposure following an investigation, the charges being held for court following the establishment of a prima facie case, and his *election* to participate in ARD. *See also Commonwealth v. Becker*, 366 Pa.Super. 54, 63, 530 A.2d 888, 892 (1987) ("[I]t is also important to remember that a criminal suspect's election of ARD is a voluntary decision.") These are proper considerations for a court which bears the heavy responsibility of determining a child's best interests.

The second issue is whether the hearing court erred in holding that the four criteria [1] set forth in *In re Wesley J.K., supra*, were met. We hold that the fourth criterion was not met.

Appellant argues that shared custody is inappropriate in the present case because the parties are unable to communicate and cooperate in promoting Sam's best interests. In

1. The four criteria set forth in *In re Wesley J.K., supra*, are: 1) both parents are fit, 2) both desire continuing involvement with their child, 3) both parents are seen by the child as sources of security and love, and 4) both parents are able to communicate and cooperate in promoting the child's best interests. *Id.*, 300 Pa.Superior Ct. at 517, 445 A.2d at 1249.

rejecting this argument, the hearing court stated, "This Court heard no credible evidence that the shared custody in this case was not in the best interest of the child." Hearing court opinion at 10. This conclusion is belied by the record.[2]

At the first hearing, appellant testified that there is no communication between the parties. N.T., 4/24/84, at 15. She testified that if she asks a specific question, she sometimes gets an answer, and sometimes does not. *Id.* She testified to appellee's refusal to cooperate in administering medicine, getting the child's shots, and inconsistency in weaning the child from the bottle. *Id.* at 19–20, 29. Appellant testified that appellee "gives as little information as he has to. He answers the exact question but I get no further details." *Id.* at 47. Appellant further testified that appellee has never questioned her nor shown any interest in "what goes on with the child" when Sam is in her custody. *Id.* Her testimony was supported by that of Dr. Douglas Ramm, a clinical psychologist, who provided vocational and academic guidance, and tangentially, advice on matters concerning custody. *Id.* at 63, 65.

Appellee, who testified at the August 21, 1984 hearing, also stated that there was no communication between the parties. N.T., 8/21/84, at 13. In response to questioning by the court, appellee admitted that he does not ask appellant about her care of Sam, and implied that he does not volunteer any information about Sam, when he stated, "Obviously she didn't ask or I would have told her." *Id.* at 38.

2. In attempting to illustrate how the record in this matter supports the hearing court's finding that the parties exhibited the minimal degree of cooperation required to support a shared custody arrangement, the dissent reproduces portions of testimony offered at the March 24, 1984 hearing. Dissenting Opinion at 372–376. However, the most recent hearing in this matter was held two years later, on March 3, 1986. During that two year period, it is clear that the degree of communication trickled away to nothing, as revealed by appellee's own testimony. N.T., 3/3/86, at 22, 23; *infra* at 376. Neither party considered the shared custody arrangement to be successful for the same reason: the parents simply could not communicate.

Appellee was even more candid at the March 3, 1986 hearing. Theretofore, appellee had desired to maintain the shared custody arrangement. N.T., 8/21/84, at 15. However, at the March 3 hearing, appellee stated he desired primary physical custody. Appellee testified, "We [the parties] don't usually talk, it's usually good-by Sammy or something in that order. Nothing between Michelle and I at all." N.T., 3/3/86, at 22. Appellee claimed that he and appellant do not even communicate or cooperate concerning Sam's medical problems. *Id.* at 23. The record is replete with examples of the parties' inability to communicate regarding major concerns of their young child's life, let alone discuss the small, day-to-day matters that arise.

This inability to communicate and the lack of even a minimal degree of cooperation between the parents is most strikingly seen in a matter brought to our attention at oral argument. Through either an inability or unwillingness to communicate and cooperate, young Sam has been enrolled in two different school districts since the beginning of the 1987–1988 school year. Counsel for the parties and even the hearing court itself must share the responsibility for this untenable situation.[3]

The Supreme Court of Pennsylvania, in *Lombardo v. Lombardo*, 515 Pa. 139, 527 A.2d 525 (1987), recently reaffirmed the propriety of a broad and searching appellate review in custody cases. The court reiterated that a reviewing court must not accept a finding which has no competent evidence to support it. *Id.*, citing *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977).

We hold that the trial court's conclusion that it is in Sam's best interest that physical custody be shared on alternating weeks is not based upon competent evidence, and such an

---

**3.** It goes without saying that shared custody does not require equal physical custody. Dissenting opinion at 376. However, it is the present alternating weekly arrangement that we must evaluate and find supported by the record, not a hypothetical plan the hearing court may order in the future.

order of custody represents an abuse of discretion.[4] While it is necessary to remand for proceedings consistent with this opinion, we direct that such proceedings take place with the utmost dispatch. *Shaffer v. Gaal*, 312 Pa.Super. 399, 458 A.2d 1020 (1983); *In re LaRue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976).

The order of the hearing court is reversed, and the case is remanded for further proceedings consistent with this opinion. Jurisdiction is relinquished.

BECK, J., files a dissenting opinion.

BECK, Judge, dissenting:

I believe that the majority exceeds the proper scope of review in refusing to accept factual findings of the trial court that are supported by the record. I therefore dissent.

The majority finds error by the trial court where the record does not reveal error. The majority's first contention is that the trial judge should have considered the fact that father-appellant was admitted to Accelerated Rehabilitative Disposition (ARD) on two counts of indecent exposure. The record demonstrates that the trial judge considered the father's ARD. In his opinion, the trial judge notes that the father was on ARD.

The judge as the finder of fact, however, believed the father's testimony that he had not committed the acts charged but consented to ARD only to avoid the embarrassment of a trial. The credibility of witnesses is a matter uniquely within the province of the hearing court. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977). Since ARD is not a conviction, the judge was

---

**4.** We note that the continual decline in the parties' ability to communicate constituted a substantial change in circumstances requiring reconsideration of the custody issue. Such a finding is a precursor to the court's reconsideration of custody. "The reasons for the rule requiring a substantial change in circumstances are no less viable because the prior court order was entered without hearing and pursuant to agreement of the parties." *Burr v. Morgart*, 339 Pa.Super. 341, 345, 488 A.2d 1155, 1157 (1985).

completely free to believe appellant's assertion that he had not committed the acts charged.

Next, my review of the record supports the trial court's disposition of shared custody. The majority finds the trial court was in error in concluding that the parties exhibited the minimal degree of cooperation required for an award of shared custody. *In re Wesley J.K.*, 299 Pa.Super. 504, 445 A.2d 1243 (1982). The majority in so concluding has exceeded the proper scope of review by disregarding the clear findings of fact made by the trial court and the reasonable inferences derived therefrom.

Our Supreme Court recently reiterated the standards to be applied upon review of a custody determination in *Lombardo v. Lombardo*, 515 Pa. 139, 527 A.2d 525 (1987). The *Lombardo* court emphasized that the appellate court's broad scope of review in custody matters was never intended to permit the overriding of findings of fact made by the trial court, provided such findings are supported by evidence in the record.

In light of the limited scope of review, it seems to me that the majority's conclusion that the trial court erred in finding the parties could not minimally cooperate cannot stand. The four *Wesley* criteria for shared custody are: 1) both parents are "fit," 2) both desire continuing involvement with their child, 3) both parents are seen by the child as sources of security and love, and 4) both parents are able to communicate and cooperate in promoting the child's best interests. *Id.*, 299 Pa.Super. at 516–17, 445 A.2d at 1249.

As we explained in *Wesley*, the fourth or cooperation criterion requires

> *A minimal degree of cooperation* between the natural parents.... 'This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared

whatever resentments and rancor the parents may harbor.'

*Ibid* (Emphasis added), quoting *Beck v. Beck*, 86 N.J. 480, 498, 432 A.2d 63, 71–72 (1981).

The rationale behind the minimal cooperation requirement is that if the parents have a total inability to make cooperative decisions relating to the child, the child will ultimately be harmed. If the parents dislike each other and fight between themselves but have the minimal ability to cooperate in decisions relating to the child, then shared custody may be appropriate. While in general shared custody is in the child's best interest in that it helps the child maintain a close, realistic relationship with both parents, these benefits may be negated in cases where joint decision making relating to the child causes such bitter disputes that the atmosphere in which the child is raised may be poisoned. I recognize that a parent may prefer sole custody. The parent may think it preferable for him or her to have the legal right to make all decisions relating to the child, but the judge must ask if such an arrangement is best for the child. I also recognize that divorce is usually predicated on disharmony between the parties and that such disharmony may extend to childrearing. Disharmony alone is not a bar to shared custody if shared custody is in the best interest of the child. The law requires only that the parties be capable of a *minimal* degree of cooperation.[1]

The majority asserts that that the trial court erred in finding the minimal cooperation criterion to be met, citing the mother's testimony that the father is uncommunicative regarding the care of the child, Sam, particularly with regard to the father's practices in weaning Sam from the bottle, and that the father refuses to administer medicine to Sam. However, examination of the record reveals clear evidence to the contrary on both of these points. Such

---

1. The fact that the trial court has found that the parties are not cooperating as fully as they might, and that it would be desirable if they would do so, does not mean that they do not exhibit the required minimal degree of cooperation. *Brown v. Eastburn,* 351 Pa.Super. 479, 506 A.2d 449 (1986).

evidence supports the factual findings and conclusions of the trial court. This court is bound to accept those findings and conclusions despite the existence of other, contradictory evidence. In almost every custody case, conflicting testimony will be offered by the parties and their witnesses. It is precisely the function of the trial court to assess the credibility of witnesses and decide whose assertions are more credible.

In the case sub judice, both mother's and father's testimony support the findings of the trial court that the parties exhibited cooperation in handling their son. The mother's own words at trial are contrary to her assertions on appeal. She gave the following testimony regarding the communication between her and the father concerning Sam's care when he was ill:

Q: (Appellee father's attorney): Were there some instances that illnesses began when [father] had the child so you would get the child in an ill condition?

Appellant: Yes.

Q: Did [father] also give you medications?

Appellant: Yes he did or if he wasn't on a prescription he'd tell me what he was doing for him.

Q: Would he tell you how the child was behaving so you knew what to look for?

Appellant: Yes.

Q: You were able to talk about those things?

Appellant: That's correct.

N.T. 4/24/84, p. 44. Father also testified that he gives Sam appropriate medicine when he is ill. N.T. 3/3/86, p. 24.

Regarding the weaning of Sam from the bottle, mother testified as follows:

Q: (Appellee father's attorney): And is it your testimony that on each of [the four occasions a month that the child is transferred] you have asked him about the bottle?

Appellant: I may not have asked him about the bottle everytime, but I asked him about other things that concerned me too.

Q: Limiting to the bottle, you had an opportunity to ask him about that.

Appellant: Yes.

Q: And each time he's answered you is that correct?

Appellant: Yes.

Q: Has he ever refused to discuss it with you?

Appellant: *No, he's never refused.*

N.T. 4/24/84, p. 29 (Emphasis added).

Having heard the testimony of both mother and father, the trial court made findings of fact that father did give the child his medicine and did communicate with mother regard-ing the care of the child. In light of the above record testimony, I cannot conclude that the trial court abused its discretion in making those findings.[2]

In addition to finding adequate communication between the parents, the trial court highlighted other factors in the case that support the appropriateness of an order of shared custody. The parties originally agreed to shared custody, *see Brown v. Eastburn,* 351 Pa.Super. 479, 506 A.2d 449 (1986); *Murphey v. Hatala,* 350 Pa.Super. 433, 504 A.2d 917 (1986), and have between themselves successfully worked out adjustments in the custody schedule for holidays, vaca-tions, birthdays, etc.. *Brown v. Eastburn; cf. Agati v.*

2. The majority states in footnote 2 that, whatever the state of the relationship between the parties at the March 24, 1984 hearing, the testimony offered at the March 3, 1986 hearing demonstrated that by then the mother and father's cooperation had dwindled away to nothing. I disagree. At the March 3, 1986 hearing, the father testified that he and the mother had worked out changes in the custody schedule to permit the mother to have Sam with her during her vacation. N.T. 3/3/86, pp. 18-19. They did this without involving their lawyers or the court. *Ibid.* The father also gave testimony that demonstrated that he and the mother communicate on important issues affecting Sam's medical care. On one occasion merely two weeks before the March 3, 1986 hearing, the mother told father when he came to pick Sam up that Sam had fallen and hit his head, N.T. 3/3/86 pp. 22–23, which alerted the father to watch for complications that might develop while Sam was in his care. The father also testified that the mother gives him any medication Sam might be on at exchange time. N.T. 3/3/86, p. 23. This testimony that the parties are capable of working together on issues such as custody scheduling and Sam's medical care supports the trial court's finding that Sam's parents possessed the requisite minimal degree of cooperation.

*Agati*, 342 Pa.Super. 132, 492 A.2d 427 (1985). Most significantly, the court found that both parents have been actively involved in their child's life to date. *See Murphey v. Hatala.*

Each parent, in fact, testified that they recognized and supported the important role the other has played and will continue to play in their young son's life. Mother testified as follows:

Q: (Appellant's attorney): What attitude or what feeling do you have concerning [father's] contact with the child?

Appellant: Well, Sam has to see him sometimes as a father. It's important for Sammy to see him.

Q: Is it your intention to exclude baby Sammy from Mr. DeNillo here?

Appellant: No.

Q: Do you feel his contact is important?

Appellant: Very important. Sammy has to know who his father is and has to have contact with him all the time no matter what.

N.T. 4/24/84, p. 21. Mother testified that she was trying to change the shared custody arrangement not out of any dissatisfaction with father's parenting of the child, but out of a desire to have more time with the child herself. When asked why she was petitioning for sole custody, she testified:

Because I like to have full custody of him. I'd like to do things with him, not saying [father] would not.... I mean I don't have anything against him, I think Sammy should see him but I'd like to have full custody of him.

N.T. 4/24/84, p. 21.

Similarly, when father was asked what custody arrangement he would prefer, he testified:

Well, of course I would like to have full custody of Sam, but I don't think it would be right to take Sam completely off of Michelle. He does need his mother. I think he needs both of us. So by taking him and giving

him to me or Michelle I don't think that would be very good. I think he needs both of us.

N.T. 8/21/84, P. 15.

In light of the evidence of record, I cannot conclude that the trial court abused its discretion in finding that shared custody was in the best interest of the child.

Shared custody is a proper vehicle for each parent to maintain maximum commitment to the child. A parent who is merely a visitor with the child and who does not engage in decision making for the child may soon attenuate his ties to the child because he or she after a period of time may feel no real engagement with the child. It is best for the child to have the active participation of both parents who take the full parental role on an ongoing basis. Divorce is always disruptive to children. Shared custody, when properly arranged, minimizes that disruption. Both parents retain full responsibility for decisions relating to the child, and that is usually in the child's best interest.

I address one final issue raised by the majority. The majority states that at oral argument it was revealed that Sam has been enrolled in two different school districts since the beginning of the 1987–88 school year. Assuming arguendo that this is true (it is not a fact of record), it in no way affects that portion of the order of the trial court entered on December 1986, relating to shared custody. Now that Sam is of school age it is essential that shared custody be redesigned so that Sam will be enrolled in only one school and reside during the school week with the parent in the school district in which he is enrolled. It would be completely proper, under an order of shared custody, to award physical custody of Sam to one parent for weekdays during the academic school year, and to the other parent for certain weekends, holidays and a portion of the summer months. Shared *legal* custody does not require equal *physical* custody; it merely requires shared decision making for the child. *Ellingsen v. Magsamen*, 337 Pa.Super. 14, 486 A.2d 456 (1984).

I would therefore affirm the order of the trial court.