**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| A.S.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| H.M.W. | : | No. 2267 MDA 2015 |

Appeal from the Order Entered November 25, 2015 in the Court of Common Pleas of Lancaster County Civil Division at No(s): CI-15-05403

BEFORE: SHOGAN, LAZARUS, JENKINS, JJ.

MEMORANDUM BY JENKINS, J.: **FILED SEPTEMBER 27, 2016**

A.S.W. ("Father") appeals from the order entered on November 23, 2015, in the Court of Common Pleas of Lancaster County, awarding H.M.W. ("Mother") primary physical custody of E.M.W. ("Child") (born in March of 2012), awarding Father partial physical custody, and awarding Mother and Father shared legal custody of Child pursuant to 23 Pa.C.S. § 5328(a). We affirm.

The trial court set forth the extensive factual history of this case in its opinion accompanying the subject order, and the trial court's recitation is supported by the testimonial and documentary evidence. As such, we adopt it herein. ***See*** Trial Court Opinion, 1/22/16, at 2-9. Mother and Father are husband and wife, but they have been separated since June of 2015. Both

are high school teachers at different high schools. Mother teaches health and physical education. Father teaches career education, driver's education, health, and physical education. Father is also the varsity soccer coach. In addition to coaching at the high school during the high school season, Father is involved in off-season and summer season soccer coaching.

On May 28, 2015, Father filed a complaint for primary physical custody and shared legal custody of Child. Thereafter, Father changed his request from primary physical custody to shared physical custody. On August 20, 2015, a custody conciliation conference was held, but no agreement was reached. On September 15, 2015, the trial court adopted the conciliation officer's recommendation and entered a temporary order awarding shared legal custody of Child to Mother and Father. Mother was awarded primary physical custody, and Father was awarded partial physical custody of Child on alternating weekends. The trial court order also directed a further custody hearing to be held on October 30, 2015. The custody hearing was continued to November 12, 2015 to obtain the testimony of Child's therapist to determine the best interest of Child.

The trial court held a custody hearing on November 12, 2015 and November 19, 2015. At the hearing the trial court heard the testimony of Mother; Father; J.A., a parent whose child plays on Father's soccer team; J.S., Child's therapist; B.L., an aquatic instructor; S.W., Child's paternal grandmother; and M.A.C., Child's maternal grandmother. On November 23,

2015, the trial court again awarded Mother primary physical custody, Father partial physical custody on alternating weekends, and shared legal custody of Child to both Mother and Father.

On December 23, 2015, Father filed a notice of appeal and a concise statement of errors complained on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following question for our review:

> 1. Whether the lower court erred in its application of the factors under 23 Pa.C.S.[] § 5328(a) in determining the best interest of the child?

Father's Brief at 7.

In custody cases, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F., III v. S.E.F.***, 45 A.3d 441, 443 (Pa.Super.2012) (citation omitted).

With any custody case under the Child Custody Act, 23 Pa.C.S. §§ 5321-5340, the paramount concern is the best interests of the child. In

applying the Custody Act, a trial court must determine a child's best interests through consideration of the following sixteen factors:

> **§ 5328. Factors to consider when awarding custody**
>
> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (3) The parental duties performed by each party on behalf of the child.
> >
> > (4) The need for stability and continuity in the child's education, family life and community life.
> >
> > (5) The availability of extended family.
> >
> > (6) The child's sibling relationships.
> >
> > (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
> >
> > (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
>
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
>
> (11) The proximity of the residences of the parties.
>
> (12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
>
> (13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
>
> (14) The history of drug or alcohol abuse of a party or member of a party's household.
>
> (15) The mental and physical condition of a party or member of a party's household.
>
> (16) Any other relevant factor.

23 Pa.C.S. § 5328.

Father argues that the trial court misapplied the factors for determining the best interest of Child pursuant to section 5328(a). Father's Brief at 11. Specifically, Father contends that the trial court "erred in finding that Mother is more likely to encourage and permit frequent and continuing contact between Father and Child." ***Id.*** at 13. Additionally, Father argues that the trial court erred in finding that "Father's employment as varsity

boys' soccer coach prevents him from having sufficient [] time with [C]hild."[1] ***Id.*** at 17.

With regard to section 5328(a)(1), which party is more likely to encourage and permit frequent and continuing contact between the child and another party, the trial court found:

> Mother is more likely to encourage and permit frequent and continuing contact between Father and [C]hild, than is Father. Despite a right of first refusal agreement between the parties, on a number of occasions Father called his mother to care for [Child] when he had a conflict, rather than Mother. This breach of commitment made by him is a serious sign to the [trial] court that he does not appropriately value either his word or Mother's relationship with [Child]. He has refused to permit [Child] to go on a vacation with Mother and her family despite a history of such events in the family. Mother has honored the agreement.

Trial Court Opinion, 1/22/16, at 11.

With regard to section 5328(a)(3), the trial court stated:

> While both parties perform parental duties, Mother has performed and continues to perform the majority of the parental duties for [C]hild. She has consistently had more available time in her schedule to spend with [C]hild and to attend to [C]hild's needs. She can get [C]hild to day care at a later and more reasonable hour for [C]hild in the morning, and pick her up earlier in the afternoon, providing more parent time. Prior to the separation, Mother was for all intents and purposes, the parent who transported [C]hild to and from daycare. She was the major nurturing parent while the family was intact, and has continued that situation into separation. All of the testimony presented indicate[s] that Father is so involved in soccer that he is simply not available at significant time for [C]hild because he

---

[1] While not specified in his brief, Father appears to challenge section 5328(a)(3), the parental duties performed by each party on behalf of the child.

> must attend various games, practices, training, and other sport-related activities.

***Id.*** at 11-12.

Moreover, the trial court stated it had "some problems with Father's credibility." ***Id.*** at 16. The trial court stated that, "Father blamed Mother for some of his problems" and "raised negative issues about the relationship between Mother and [Child]." The trial court found that Father's "hostility colors those perceptions and makes it difficult to know the degree of their accuracy." ***Id.*** The trial court further found that Father "inaccurately minimized the problems posed by his schedule and that much of his testimony was confusingly difficult if not contradictory because of a variety of inconsistencies contained therein." ***Id.*** Consequently, the trial court found that "an examination of the listed aspects of [C]hild's life and her relationship with her parents indicated that Mother as the primary custodial parent would better serve [C]hild's best interest." ***Id.*** Father's issue on appeal seeks review of the trial court's findings of fact and credibility determinations. Our standard of review, however, does not permit this Court to re-find facts, re-weigh the evidence, or to impeach the credibility determinations of the trial court. We may only reject the trial court's conclusions if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court. ***See C.R.F., III***, 45 A.3d at 443. Furthermore, the trial court analyzed each factor regarding custody and

found that, as stated above, the factors weighed in Mother's favor. **See** Trial Court Opinion, 1/22/16, at 11-16. We find no abuse of discretion.

For the foregoing reasons, we affirm the order of the trial court awarding primary physical custody to Mother, partial physical custody to Father, and shared legal custody to both Mother and Father.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/27/2016

Circulated 09/07/2016 01:38 PM

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

A.S.W.
Plaintiff

v.

H.M.W.
Defendant

No. CI-15-05403

SUPER. CT. NO.: 2267 MDA 2015

ENTERED AND FILED
16 JAN 22 PM 2:19
PROTHONOTARY'S OFFICE
LANCASTER, PA.

BY: GORBEY, JUDGE

**OPINION SUR APPEAL**

Procedural History

This matter was initiated on May 28, 2015, when a Complaint in Custody was filed by A.S.W. (Father) against H.M.W. (Mother) for custody of the parties' child E.M.W. (E.M.W.), born on March 30, 2012. On June 19, 2015, an Order of Court was issued scheduling a Custody Conciliation Conference for July 29, 2015. An uncontested motion for continuance of the Conference and waiver of custody case time requirements was filed on July 20, 2015 and approved by the Court on July 21, 2015. The conference was held on August 20, 2015, and no agreement was reached. On September 15, 2015, the Court adopted the Conference Officer's recommended order and scheduled a hearing before the court for October 30, 2015. On October 30, the Court and the attorneys for the parties discussed the child's ongoing participation in therapy and by agreement continued the matter until November 12, 2015 in order to allow both parents time to confer with the child's therapist. The

therapist, whose testimony was deemed to be necessary, was directed to prepare a written report to be sent to the attorneys.

A hearing was begun but not completed on November 12, 2015, and was continued to November 19th, 2015 for the purpose of completing the testimony. On November 20, 2015, the Court issued a Custody Order giving shared legal custody of E.M.W. to the parties, primary physical custody to Mother and partial physical custody to Father on alternating weekends and every Tuesday and Thursday evening.

On December 23, 2015, Father filed a notice of Appeal of the November 20 Order to the Pennsylvania Superior Court. Said Notice was served upon the Court with a Concise Statement of Errors Complained of On Appeal.

**FACTUAL HISTORY**

Father and Mother are husband and wife and E.M.W. is their biological daughter. The child lived with both parents from her birth to her parents' date of separation in June of 2015 when Mother left the marital residence. (N.T. 14) Since separation, Mother has had primary physical custody of the child and Father has had partial physical custody on alternate weekends and specific weekday evenings. (N.T. 18)

Both parents are high school teachers at different schools. Father teaches Career Education, Driver's Education, Health and Physical Education.(N.T. 13) Mother teaches Health and Physical Education. (N.T. 173) Father is also the head varsity soccer coach at his school. (N.T. 15)[1] That position involves his coaching, monitoring

[1] Although the hearing occurred on two separate dates, the two transcripts were paginated as one unit. The citations to the transcript will therefore not refer to the hearing dates, but only the page numbers.

and supervising the players as they play, and his schedule is dominated by his soccer coaching duties. Outside of his school coaching, Father is also involved in off-season and summer soccer (N.T. 17) The beginning of soccer season is the first "teen" Monday in August. The season ends the second week in October, though it can go beyond that if the team goes post-season. On Fridays, starting sometime in March and continuing for the rest of the month, there are pickup games. When the pickup sessions end, Futsal league starts on Saturdays. The Futsal Saturday games continue until school ends in June and Futsal[2] is then scheduled for Tuesday and Thursday, running from 8 to 10 a.m. until the beginning of the season in August. (N.T. 70-73). On the first "teen" Monday of August, "two a day" practices begin, from 8 to 10 a.m. and 6 to 8 p.m. and last for one week, Monday through Friday. (N.T. 16 –17) Thereafter, school and soccer league then begin. Mother mentioned other events that intruded on Father's time with his daughter. For instance, he had to change their custody schedule for the weekend before the hearing, because there was an all-star game he had to attend for one of his soccer players. (N.T. 218) She also testified that "his soccer schedule started in January and continues all the way up through summer. And as it gets closer to the season, it becomes more intense and more involved." (N.T. 193) Both parents testified to a number of occasions when his contact with his daughter had to be changed, or he missed one of her activities because of a soccer event. (See, e.g., N.T. 64 (pickup from daycare), 85 (tumbling), 118-119 (library concert), 131 (therapist), 193 (swimming), 195 (dance)). Father informed the Court that he can make himself more

[2]Futsal is an indoor soccer game with a small ball that doesn't bounce. It is a form of indoor soccer. N.T. 16.

available than his schedule indicates, because during the soccer season he has assistants who can lead the practice. (N.T. 80) Mother said that he told her the same thing throughout their marriage, but never followed through. (N.T. 218, 247) Father has been more available for the child's activities in early 2015 after his lawyer told him to be more involved. (N.T. 195-196)

Mother has a full time teaching job during the school year and teaches an online course during the summer with a one hour a week commitment for five weeks. (N.T. 174) Testimony was uncontradicted that when Mother is not working her attention and concern was directed toward her daughter. Before separation she and E.M.W. had a busy life, filled with activities for the child and a specific daily schedule. That situation continued after separation also. (N.T. 74, 185) Father admitted that prior to their separation he did not spend much time with E.M.W., his reason being that Mother did not permit him to. He said she was rigid and kept E.M.W. on a tight schedule which excluded him. (N.T. 60) Although April of 2015 was the first time he had ever watched the child overnight, he explained to the court that he had been given only limited opportunity to do so by Mother. (N.T. 128) Regarding medical appointments, he explained that he only had made them for the child a few times, but if he had been allowed by Mother he would have done so every time it was necessary. (N.T. 129)

Post separation, when each party had custody of the child alone, both engaged in many interesting activities with E.M.W. and both have a healthy and organized schedule and environment for her. (N.T. 19 *et seq.)* E.M.W. also has her own activities such as gymnastics, dance and the like, for which the parents serve as

spectators. She has continuing swimming lessons, in which the parents are permitted to participate in the water with her. Mother has always been the participating parent for that event, and the swimming instructor told the court that the child is happy in class with her mother. When during one of Father's appearances, E.M.W. was acting particularly active and energetic, he appeared to be unsure and told the teacher he didn't know why she was acting like this. The teacher had to reassure him that it was just E.M.W. acting like E.M.W. ( N.T. 110)

Mother was clearly the child's main care giver prior to separation and continues to use the schedule she had used since the child was born. (N.T. 74, 185). She always dropped the child off at daycare and picked her up after, except for once or twice when she had something she couldn't miss. (N.T. 179) Father agreed, saying that he occasionally took the child to day care, but in summer he could not pick her up because of soccer practice. (N.T. 25, 64) Mother got the child ready for school. She made her breakfast and cooked dinner. The majority of times, she gave E.M.W. her bath. She scheduled medical appointments and did the established bedtime routine. (N.T. 188) During much of their life prior to separation, Father wasn't at home. His school duties, particularly soccer, kept him away sometimes until well after dinner. (N.T.189) Only Mother took her to gymnastics. (N.T. 84) Mother took her to dance class, and Father would come after soccer. (N.T. 194-95) Mother arranges play dates for E.M.W. with friends from school and with neighborhood children. (N.T. 1 187) Father also arranges play dates for her with her cousins from his family. He testified that he has trouble arranging dates with friends because he finds it difficult to ascertain the identities of appropriate neighborhood or school friends. (N.T. 79) For Halloween

of 2015, Father asked to trick and treat with E.M.W.. When Mother agreed and asked him to accompany them in her neighborhood, he decided not to participate. (N.T. 187)

Father has extended family in Lancaster County and the child interacts with them often, particularly her grandparents. (N.T. 50) They have dinner with his parents every Sunday. (N.T. 86) He arranges play dates for E.M.W. with her cousins. (N.T. 79, ) Mother's parents live in New Jersey and she has two sisters who live in Virginia. They visit back and forth several times a year and go on a longer family vacation in the summer. (N.T. 185) It is during these visits that E.M.W. meets and interacts with her other family members. This year, when Mother spoke to Father in April about going for the family vacation with her parents, Father insisted that E.M.W. could not go. (N.T. 159)

The parties had an agreement that each would have a right of first refusal if the custodial parent had a conflict. Father has disregarded this agreement on several occasions, calling on his mother (the Paternal Grandmother) instead of Mother. Mother has always taken the child when asked to do so. (N.T. 213)

Father at first requested primary custody, but has now changed that request to 50/50 shared physical custody. He told the court that he was concerned at first that Mother would remove the child from Pennsylvania, and that if he had primary custody he could keep her here. He acknowledged at the hearing that he had spoken out of fear and no longer would ask for sole custody. (N.T. 140) He minimized his busy schedule in his testimony, insisting instead that it would be in E.M.W.'s best interest to attend his soccer games with him, saying that at the Futsal games there is space for her to play while he is involved with the game and that at practices, she could interact

with the players and their parents, which would enable her to gain social skills (N.T. 32, 138-139) He asserted that he did have flexibility in his schedule to allow time for his child. Mother's opinion of that assertion is that he had repeatedly told her the same thing, but never exhibited the ability to change his schedule to spend more time with the child. He has proposed a 4/3/3/4 day schedule. (N.T. 43) He believes that being with him is in E.M.W's best interest because he lives in the home she grew up in, he doesn't push her the way Mother does, so that she is more relaxed and is not afraid to make mistakes with him, he doesn't get angry when the house is messy like Mother does, and she acquires the values of trust, integrity and responsibility by watching him coach his students at soccer games. (N.T. 53 *et seq*) There was also testimony from Mother and her mother who said that Father had told them that despite his schedule he could have full custody because his parents would take care of E.M.W.. (N.T. 158, 205)

Communication between the parents has its difficulties. Mother told the Court of three instances in which Father withheld information concerning the child from her. They had agreed to raise the child Catholic and did attend a Catholic Church on occasion although Father has a Lutheran background. (N.T. 87) However, after separation, Father took E.M.W. to an orientation at a friend's Lutheran church and enrolled her in Sunday School, although she never actually attended. (N.T. 33-34, 87) He not only did not discuss this with Mother, but did not put her contact information on the application. (N.T. 91, 202) Defending his action, he told the Court that he would not expect Mother to tell him if she changed the child"s religion. (N.T. 88) Second, after the child told her that she didn't like the way Mr. Ashley washed her hair, Mother asked and

learned from Father that he had left a male friend alone with E.M.W. while she was in the bathtub because Father had to finish chairing a meeting dealing with soccer. The third incident was a time when E.M.W. fell off the bed, and landed on her head; and although she exhibited physical symptoms that upset Father, he neither took her to the doctor nor called Mother, not telling her until two days later. There was also a time when the child's school sent a letter to the marital residence, but not to Mother's residence, that said the child was being transferred to a different class. Father did not inform Mother. Mother said she lets father know what is going on with the child. Father testified that Mother hasn't notified him of all of the child's developmental milestones, although he was unable to remember a specific instance. (N.T. 130)

The child's therapy is another point of contention. E.M.W. has a habit of chewing on her hair, fingernails and clothing. Mother arranged for a consultation with a therapist in order to ascertain whether this was a sign of stress or just a bad habit. Father did not attend the parents' first meeting with the therapist. (N.T. 216) He at first agreed with the decision, but now expresses disagreement, contending that the only place that the activity occurs is at Mother's house, and neither he nor her teachers see it. However, the child's paternal grandmother testified that she has seen the behavior at Father's house, and that when she went to hug the child, her hair was wet. (N.T.152) And during Father's testimony, he said he saw her chewing at his house, but thought it was just a bad habit. (N.T. 145) Her teachers have also seen the behavior, because they have told him that its no worse than other children in the class. (N.T. 48) Father himself said that he heard from one of the teachers that the child was always chewing on something unless she was very busy. (N.T. 45) Because of the early stages of

therapy, Jennifer Smoker, the therapist was unable to characterize the behavior in any meaningful way. The parents agreed that it should continue until the therapist had a better understanding of what was going on. (N.T. 103)

Father's testimony and actions contained a great deal of hostility towards, and criticism of Mother, sometimes subtle and sometimes not so subtle. He said, for instance, that prior to separation "she did not include him in her planning for E.M.W., met his plans with disdain and sometimes sabotage" his plans. He said he finds it difficult to speak with her because she isn't receptive to his discussions about custody. (N.T. 35-36) He told the Court also that the child exhibited negative body language when with her Mother. (N.T. 38) When he missed an open house for preschool parents, he told E.M.W. that the reason for his absence was that Mother didn't remind him. (N.T. 203) When Mother moved out, Father walked the child around the home, pointing out expressly everything that Mother had taken with her or left for them. (N.T. 209) He did not always honor her right of first refusal if he had a conflict. (N.T. 212) He tried to limit his daughter's contact with Mother's family.

## ISSUE

Whether the Court erred in granting primary physical custody of a three year old child when, although both parents love and parent the child appropriately, Mother has been the primary nurturing parent since the child's birth, has substantially more time to spend with the child than does Father, is more likely to foster the child's relationship with Father, Father sometimes exhibits hostility toward mother in his testimony and communications with the child, Father failed to inform mother of substantial events in

child's life, Father took action to interfere with contact between mother's family and the child, and Mother seems to be more aware of the child's needs and environment.

## ANALYSIS

The Court's paramount decision in a child custody case is to decide what is in the best interest of the child. *Costello v. Costello*, 666 A. 2d 1096, 446 Pa. Super 371 (1995). A determination of what is in the best interests of the child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellection, moral and spiritual well-being. *Alfred v. Braxton*, 659 A.2d 1040, 442 Pa. Super 381 (1995) A shared custody arrangement may be ordered by the Court if both parents are 1) capable of making reasonable child rearing decisions and willing and able to provide love and care for their children; 2) both parents evidence a continuing desire for active involvement in the child's life; 3) both parents are recognized by the child as a source of security and love; 4) and a minimal degree of cooperation between the parents are possible ; *Hill v. Hill*, 619 A.2d 1086, 422 Pa. Super 533 (1993); *In re Wesley J.K.*, 445 A.2d 1243, 299 Pa. Super 504 (1982) Additionally, the Superior Court has directed that in making its decision, the trial court must consider the factors set out in Section 5328 of the Pennsylvania Custody Statute.

This Court included its §5328 conclusions in its order of November 20, 2015. An expanded discussion of these items is as follows:

§5328. Factors to consider when awarding custody

a. Factors – .........

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

The Court finds that Mother is more likely to encourage and permit frequent and continuing contact between Father and child, than is Father. Despite a right of first refusal agreement between the parties, on a number of occasions Father called his mother to care for E.M.W. when he had a conflict, rather than Mother. This breach of a commitment made by him is a serious sign to the court that he does not appropriately value either his word or Mother's relationship with E.M.W. He has refused to permit E.M.W. to go on a vacation with Mother and her family despite a history of such events in the family. Mother has honored the agreement.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

There was no past or present abuse by either parent. There has been no involvement with the Children and Youth Social Service Agency. However, the Court is somewhat taken aback by Father's belief that his 3 year old child's best interest will be served by attending frequent high school soccer games and practices with him when his attention is taken up with the players and the action, and the child is left to play alone, without an assigned caretaker. The Court can appreciate Mother's concern about the lack of supervision during those times.

(3) The parental duties performed by each party on behalf of the child.

While both parties perform parental duties, Mother has performed and continues to perform the majority of the parental duties for the child. She has consistently had more available time in her schedule to spend with the child and to attend to the child's

needs. She can get the child to day care at a later and more reasonable hour for the child in the morning, and pick her up earlier in the afternoon, providing more parent time. Prior to the separation, Mother was for all intents and purposes, the parent who transported the child to and from daycare. She was the major nurturing parent while the family was intact, and has continued that situation into the separation. All of the testimony presented indicate that Father is so involved in soccer that he is simply not available at significant times for E.M.W. because he must attend various games, practices, training, and other sports-related activities.

(4) The need for stability and continuity in the child's education, family life and community life.

Both parents evidence a stability and Father continues to live in the marital residence in which the child resided for all of her life. However, Mother has continued the schedule of time and activities which the child experienced prior to the parties' separation, and has fewer extraneous distractions to interfere with her parenting schedule.

(5) The availability of extended family.

Father has a close relationship with his family, who live in the Lancaster area. Prior to separation, his parents visited with Father and Mother and E. every Sunday afternoon. Father's mother would baby-sit E. at various times. He now sees his parents often and the children of family members are E.'s only playmates when she is in his custody. Mother's family is not local. Her parents live in New Jersey and her sisters live in Virginia. However, prior to separation there were a number of yearly visits back and forth and long vacation visits and it seems that these

will continue since Mother has a close relationship with her family. While E. would see father's parents more often, she clearly is connected to and will continue to see mother's family.

(6) The child's sibling relationships.

There are no siblings.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

The child is only three years of age and cannot express a preference.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

This is a troublesome area. While Father has not explicitly attempted to turn the child against Mother, some of his attitudes and behavior have that potential. He exhibited anger in his demeanor on the witness stand that was very obvious to the court. Along with that anger, he expressed hostile and negative views of Mother, such as when he failed to attend one of E.'s activities and expressly blamed it on Mother to the child, saying that "Mommy forgot to tell me." He has failed to confer with Mother about several important and basic aspects of the child's life: he enrolled this Catholic child in a Lutheran Sunday School without telling Mother; he failed to tell Mother in a reasonable time about E.'s hurting her head and exhibiting physical symptoms of great concern to him; he has breached a right of first refusal agreement and seems to prefer to have E. watched by his parents; he has requested a complex 50/50 custody arrangement and expressed satisfaction that such would keep Mother from taking the child on long visits with her family. As she grows, E. will

certainly learn from such behavior that Father does not value her continued relationship with Mother and Mother's family.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

Both of these parties can maintain a loving stable nurturing relationship with the child. It was clear to the court that both parents love the child and are dedicated to her welfare. However, the court is concerned about the possibility that stress has created nervous habits for the child, and is not convinced by Father's negative attitude toward giving the child help in the form of therapy. The Court also has concerns about Father's conveying negative attitudes to the child about Mother and Mother's family.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

Again, both parties can parent according to this child's needs, but the Court sees Mother as having the edge. For instance, her requirement that E. go to bed on time was based on a reading of her child's crankiness when tired; Father attributed it to mother's rigidity as a "drill sergeant". It appears to the court that Father is allowing his hostility toward Mother to interfere with his parental decision making, and he must learn to curtail this tendency. Father's belief that E. will be benefitted by being with him full time and attending his soccer activities also concerns the court. Attendance at the games every now and then with appropriate supervision will undoubtedly benefit the child. But for more than that, we must remember that soccer is father's thing, not the preference of a three year old little girl. Mother appears to the Court to be more in sync with E.'s needs and preferences.

(11) The proximity of the residences of the parties.

The parents live ten to twenty minutes from each other. They can use the same day care provider and are close enough to make alternate appropriate arrangements for the child.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

Mother is more available to care for the child, since she does not have the equivalent of Father's extra-curricular soccer activities. Both can certainly make appropriate child-care arrangements, in that they have each other and Father's mother available.

(13) The level of conflict between the parties and the willingness of the parties to cooperate with one another....

There is a certain level of conflict here, mostly seen in Father's hostile attitude and behavior toward Mother, and his tendency to blame her for his shortcomings in relation to E.. The Court is concerned that this approach will grow worse as the child grows older, and cautions Father to examine his own behavior and beliefs rather than blame others for any problems he has with the custody matter.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

There is no drug or alcohol abuse in either party's household.

(15) The mental and physical condition of a party or member of a party's household.

Neither party has a problematic mental or physical condition that will interfere with care of the child.

Consideration of the above factors have convinced this Court that primary physical custody in Mother would serve Elizabeth's best interest. Mother is more likely

to promote the child's relationship with Father, she has continued into separation her provision of the parenting duties connected with the child, she has more free time to devote to the child, she has less hostility toward father than he has toward her, which will maintain the custody arrangement without unnecessary difficulties.

Mother believes that the child is doing fine under the current schedule, and the Court accepts her opinion. (N.T. 242) At the hearing, Father blamed Mother for some of his problems, such as when he asserted to E. that he missed a school meeting because Mother hadn't reminded him. Father also raised negative issues about the relationship between Mother and E., such as his perception of Mother's rigidity and negativity in scheduling and interaction and the child's negative body language when with Mother. ( N.T. 35-38) However, the Court finds that his hostility colors those perceptions and makes it difficult to know the degree of their accuracy. The Court also finds that he inaccurately minimized the problems posed by his schedule and that much of his testimony was confusingly difficult if not contradictory because of a variety of inconsistencies contained therein. The Court therefore has some problems with Father's credibility. This does not mean that the Court denies that Father is not a loving and nurturing father; it is just that an examination of the listed aspects of the child's life and her relationship with her parents indicates that Mother as the primary custodial parent would better serve the child's best interests.

**CONCLUSION**

Based on the above discussion, the Court finds that Mother is the appropriate primary custodian of E.W. and that Father has not provided the facts

supporting a shared custody arrangement. The Order of November 20, 2015 shall remain in effect.

BY THE COURT:

LESLIE GORBEY, JUDGE

Attest: Heather L. Conrad, Deputy

Copies to:
Michael E. McHale, Esquire
Lisa J. McCoy, Esquire

NOTICE OF ENTRY OF ORDER OR DECREE
PURSUANT TO PA. R.C.P. NO: 236
NOTIFICATION - THE ATTACHED DOCUMENT
HAS BEEN FILED IN THIS CASE
PROTHONOTARY OF LANCASTER CO., PA
DATE: 1-22-16